Argued and submitted November 25, 2003, affirmed June 16, petition for review denied September 28, 2004 (337 Or 476)

STATE OF OREGON,
*Respondent,*

*v.*

BRIAN EDWARD CHRISTINE,
*Appellant.*

01CR2994FA; A118373 (Control)

STATE OF OREGON,
*Respondent,*

*v.*

RUTH E. CHRISTINE,
*Appellant.*

01CR2994FB; A118396
(Cases Consolidated)

93 P3d 82

Edgar J. Steele argued the cause and filed the briefs for appellants.

Janet A. Klapstein, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

LINDER, J.

## LINDER, J.

In this consolidated appeal, defendants, who are husband and wife, challenge the sufficiency of the evidence to support their convictions for robbery in the first degree. *See* ORS 164.415. The convictions were based on evidence that defendants forced state protective service caseworkers at gunpoint to turn over a state-owned van in which defendants' children were being transported to foster care. A short distance later, defendants abandoned the van and absconded with the children in a different vehicle. On appeal, the only issue is whether the abandonment of the van and its contents precludes an inference that defendants had the requisite intent to steal, which is an element of robbery. We conclude that the evidence created a jury question on defendants' intent, and we therefore affirm.

Viewed in the light most favorable to the state,[1] the facts are as follows. Defendants Brian and Ruth Christine were living with their three daughters in a converted school bus when police received an anonymous report that one of the children appeared to be malnourished. An investigation of the report revealed that all three children were emaciated, particularly the youngest, and all three appeared to be suffering from abuse of various kinds. As a result of the investigation, the three children were taken into state protective custody, made wards of the court, and placed in foster care.

During the months that followed the initiation of protective custody of the children, the relationship between defendants and state caseworkers was strained. Defendants objected to the state's custody of the children and demanded their return. Among other disagreements and disputes, defendants and the caseworkers had difficulty reaching an agreement on terms of visitation. As a result, several months passed before defendants were able to visit the children. Once visits were allowed, they usually were arranged on short notice to defendants to avoid defendants' discovery of the children's whereabouts.

---

[1] *See State v. King*, 307 Or 332, 339, 768 P2d 391 (1989).

One year after the children were placed into foster care, defendants petitioned and received court approval for visitation on July 19 and August 1, two of the daughters' birthdays. The visit on July 19 was uneventful. But not so for the visit on August 1. On that day, two state caseworkers, Nelson and Barrett, drove the children in a state-owned van from the children's foster home in Bandon to a prearranged meeting place—a state office in Grants Pass. The visit was similar to the prior visits, with one significant exception. After prior visits, a state caseworker had stayed to meet with defendants and discuss issues about the children. That post-visit meeting between defendants and a caseworker also gave the persons transporting the children a "head start," which safeguarded against defendants following and discovering the location of the foster home. On August 1, however, defendant Brian Christine complained of a stomachache. Instead of staying to speak with the state caseworker as on past occasions, defendants went immediately to the parking lot.

Nelson and Barrett left in the van with the children. Nelson first drove south toward the freeway, checking to see if defendants were following. When he was satisfied that they were not, he reversed course and traveled north on the freeway. Much later, about halfway back to Bandon, Nelson stopped the van at a rest area for a break. It was the same route that the state caseworkers had used on the way to Grants Pass. After the break, Nelson and Barrett buckled the girls into their car seats. As Nelson was getting into the driver's seat, defendant Brian Christine opened the van door, pointed a loaded gun at Nelson's chest, and instructed both Nelson and Barrett to get out of the van. They complied. Nelson asked to keep his cell phone, but the request was ignored. Defendant Brian Christine took the keys, got in the van, and drove off with the three children and the van's contents.

Nelson and Barrett found a pay phone and called police to report the abductions. They gave officers a description of the van and its license plate number. A law enforcement helicopter that happened to be in the area looking for marijuana cultivation sites was diverted to the freeway airspace to look for the stolen van. Meanwhile, two miles north, workers at the Round Prairie Mill had spotted a suspicious

white sport utility vehicle (SUV) parked in a secluded area of a nearby gravel lot. As described by one of the mill workers, the man sat there for about 15 minutes, talking into a hand-held device. Then, the mill worker saw a state van pull into the lot, followed by a blue Datsun driven by a blonde-haired woman. The woman in the Datsun and the man driving the state van got out to talk. After that, the van driver ran rapidly to the Datsun, then moved hurriedly from it to the SUV. The mill workers were distracted briefly at that point, but they looked back to the area and saw the SUV drive away. The Datsun and the state van had been left behind. One of the mill workers called police to report the odd behavior and the abandoned vehicles.

At about the same time, officers in the surveillance helicopter also spotted the van and landed briefly to inspect it. The children were missing. Later, additional police came to the area to recover the van and to seize the Datsun. The area was about two miles from the rest area where the van had been stolen and the children had been abducted. The van was undamaged. The keys were under the seat, as was Nelson's cell phone, other personal possessions belonging to Nelson and Barrett, a loaded .357 Magnum revolver, and a pair of two-way radios. In the Datsun, officers found a charging device for a two-way radio that matched the radios in the van, and a map with several locations circled, including the rest area and the city of Bandon. The vehicles were not readily visible from the nearby freeway because they had been left behind and were obscured by blackberry vines that were taller than the van.

Police traced the Datsun to Reppert, who had sold it to defendants. Reppert had also given defendant Brian Christine a handgun and other property. According to Reppert, several weeks before the abduction, he had interrupted a conversation between defendants and had seen their written plan to "get the girls" and "go to the woods."

Two days after they recovered the van, police arrested defendant Brian Christine in Big Timber, Montana, after stopping him for speeding. He was driving a rented car. The rental records indicated that the car had been rented by another individual, Gerwan. The police obtained a search

warrant for Gerwan's address where they found a white SUV containing a blonde wig, keys to the Datsun, and a note with directions to a site in Winston, Oregon, near the Roseburg Lumber Forest complex, about four miles from the Round Prairie Mill. Police located the children the next day. They were with their mother, defendant Ruth Christine, in a remote home in the mountains 45 miles from Missoula, Montana. After locating them, police returned the children to protective custody. Defendants were arrested, charged, and convicted of robbery in the first degree based on their forcible theft of the van and its contents while armed with a deadly weapon.[2]

As already noted, the only issue on appeal is whether the evidence was sufficient to establish that defendants acted with the intentional mental state required for the crime of robbery. To provide context for the parties' arguments in that regard, we begin by examining the statutes that specify the requisite intent.

Under Oregon's criminal code, robbery consists of the use or threatened use of physical force to commit or attempt to commit theft under specified aggravated circumstances. *See* ORS 164.395 - 164.415.[3] As pertinent in this case, robbery is elevated to the first degree if, in committing or attempting to commit forcible theft, the defendant is armed with a deadly weapon. *See* ORS 164.415. Because the crime of robbery subsumes a completed or attempted theft, the mental state for robbery is derived in part from the theft statute and the definition of theft.

To commit theft, a defendant must act with the "intent to deprive another of property or to appropriate property to the person or to a third person[.]" ORS 164.015. Both "deprive another of property" and "appropriate property" of another are further defined by statute. Under ORS

---

[2] Defendants were also convicted of custodial interference in the first degree, ORS 163.257, and unauthorized use of a motor vehicle, ORS 164.135. They do not challenge those convictions on appeal.

[3] ORS 164.395 was amended in 2003. Or Laws 2003, ch 357, § 1. The parties do not argue that those amendments affect our analysis in this case. Accordingly, and because the events here took place in 2001, we refer to the 2001 version of ORS 164.395.

164.005(1), to "appropriate property of another for oneself or a third person" means to:

"(a)   Exercise control over property of another, or to aid a third person to exercise control over property of another, *permanently* or for so extended a period or under such circumstances as to acquire the major portion of the economic value or benefit of such property; or

"(b)   Dispose of the property of another for the benefit of oneself or a third person."

(Emphasis added.) Under ORS 164.005(2), to "deprive another of property" means to:

"(a)   Withhold property of another or cause property of another to be withheld from that person *permanently* or for so extended a period or under such circumstances that the major portion of its economic value or benefit is lost to that person; or

"(b)   Dispose of the property in such manner or under such circumstances as to render it unlikely that an owner will recover such property."

(Emphasis added.)

Focusing on the reference to "permanently" in those definitions, defendants argue that, to support their conviction for robbery in this case, the evidence must establish that they intended to deprive state workers of the van or to appropriate the van and its contents on a permanent or "nearly permanent" basis. They urge that the evidence in this case falls short as a matter of law because the state proved only a temporary deprivation—that is, at most, defendants took the van, drove it a short distance, and "abandoned it in a public area." According to defendants, the "only inference" that a jury could draw was that defendants intended "to use the van for a short period in order to make good their escape and that they intended that the van be found."

In response, the state disagrees that the statutory definitions contain a permanency or "near permanency" requirement. In that regard, the state points to the alternative phrasing in ORS 164.005(1)(a) and (2)(a)—permanently *or* for so extended a period *or* under circumstances that the major portion of its economic value *or* benefit is lost to that

person—to urge that the intent to permanently control or withhold property is just one of several mental states specified. Thus, the state argues that a defendant can "appropriate" property by temporarily exercising control over or withholding it under circumstances that deprive the possessor of a significant benefit of the property—such as, here, the use of the van as a mode of transportation. Similarly, the state points out that the requisite mental state can consist of intending to dispose of property for self-benefit, ORS 164.005(1)(b), or in such a way as to make it unlikely that the owner will recover it, ORS 164.005(2)(b). Alternatively, the state argues that, even if the intent element contains a permanency or near permanency requirement, the jury in this case could conclude that defendants had such an intent when they initially took the van and only later changed their plans after realizing that the van would be easy to spot. *See State v. Albert*, 117 Or 179, 185, 242 P 1116 (1926) (the requisite intent for theft must exist at the time of the taking).

Interpreting the statutes that bear on the intent required for theft (and, hence, for robbery) presents us with a question of legislative intent, which we resolve using the familiar methodology set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). At the first level of analysis, we consider not only the express definitions provided by the legislature but also the preexisting common law and the statutory framework within which the pertinent statutes were enacted. *Denton and Denton*, 326 Or 236, 241, 951 P2d 693 (1998).

At common law, the crime of "larceny" (now termed "theft") required proof that a defendant acted with the intent to deprive another "permanently" of property. *See generally State v. Jones*, 119 Or 320, 322, 249 P 360 (1926) (identifying and applying common law). As one respected authority on criminal law has explained, the common-law notion of intending to deprive another "permanently" of property "conveys the idea in a general way but requires some explanation." Rollin M. Perkins, *Criminal Law* 224 (1957). At common law, the fact that a person took the property of another with the intent to possess or use it only temporarily did not, in and of itself, defeat a conclusion that the taking was intended to be permanent in nature. Whether the person

acted with the requisite intent depended on whether he or she intended to return the property to the owner or, instead, to dispose of or abandon the property under circumstances that risked its loss to the owner:

> "It is also necessary to understand that there may be an intent to steal without a fixed purpose to deprive the owner of his property permanently. A wrongful use of a temporary nature is not sufficient for the intent to steal if it does not seriously imperil the owner's substantial rights in the property; but it is otherwise [if] a wrongful temporary use [is] of a nature which intentionally creates an unreasonable risk of permanent loss to the owner.

> "An intent to take the property of another by trespass, use it for a temporary purpose and return it, is not an intent to steal. An intent to take the property of another by trespass, use it for a temporary purpose and then abandon it, *may* be an intent to steal. An intent of the latter type is not an intent to steal if the intended abandonment is under such circumstances that the property will in all probability be restored to the owner; but it is an intent to steal if the intended abandonment will create a considerable risk of permanent loss to the owner. To take a horse from the owner's pasture on a farm, ride it a mile or two, and then turn it loose does not create any considerable risk of permanent loss to the owner; but such a risk is created if a traveler, caught in an unexpected rain, takes an umbrella in one city and abandons it in another city some miles away."

*Id.* at 225 (emphasis in original; internal citations omitted). Similarly, at common law, larceny could be committed by taking property, either temporarily or permanently, from another intending to defeat a significant property right of the possessor. *Id.* On the other hand, a defendant who "takes another's property intending at the time he takes it to use it temporarily and then to return it unconditionally within a reasonable time—and having a substantial ability to do so— lacks the intent to steal required for larceny." Wayne R. LaFave, 3 *Substantive Criminal Law* § 19.5(b), 89 (2d ed 2003). But "[a]n intent to abandon, accompanied by a not-too-well founded hope that the property will find its way back to its owner[,] does not negative the intent to steal." *Id.* at 91.

The Oregon Supreme Court adopted the common law's expansive view of what constitutes an intent to "permanently" deprive another of property in *State v. Langis*, 251 Or 130, 444 P2d 959 (1968), which involved facts that are analogous to the facts here. In *Langis*, the defendant stole another person's car in Eugene. Police stopped the car in Roseburg, about 70 miles away. The defendant claimed that he did not have the requisite intent to permanently deprive the owner of the car because he intended to leave the car in Roseburg in "perfect condition." *Id.* at 131. Adhering to the common-law view, and quoting from the passage from Perkins quoted above, the court held that the necessary intent to deprive the owner of property permanently "can be inferred from abandonment" under circumstances in which the intended abandonment creates a "considerable risk that the owner will suffer a permanent deprivation of his property." *Id.* at 132-33.

In 1971, the legislature revised Oregon's criminal code generally and, in the process, consolidated the various theft-related offenses. *See generally State v. Cox*, 336 Or 284, 82 P3d 619 (2003). The legislature crafted the definitions of "appropriate" and "deprive" in ORS 164.005(1) and (2) in such a way, however, as to "retain the traditional distinction" between larceny, which requires a thief to intend permanent or virtually permanent loss to the owner of the possession and use of property, and offenses that require the intent to obtain only temporary possession of property or to cause temporary loss to its owner. Commentary to Criminal Law Revision Committee Proposed Oregon Criminal Code Final Draft and Report § 121, 130 (July 1971). Thus, the mental state required for theft under Oregon's criminal code is the same as that required for common-law larceny.

The text of the pertinent statutes, considered together with the preexisting common law and statutory framework within which those statutes were enacted, is illuminating. Defendants' position is partly correct—the state must prove an intent to cause permanent or near-permanent deprivation or appropriation of property. But the state is correct that an intent to use or control property temporarily is sufficient if the owner or rightful possessor of the property is divested of a significant benefit of the property through that

temporary use or control or if the property is abandoned or disposed of under circumstances that risk its loss to the owner. In effect, as revised in 1971, the definitions of "appropriate property" and "deprive another of property" were drafted to codify the more expansive understanding of the criminal law—*i.e.*, that temporary control or use of property could permanently or virtually permanently impair the property rights of the owner, depending on the circumstances.

With that understanding, we return to the evidence, viewed in the light most favorable to the state. To accomplish the children's abduction, defendants took the van and its contents forcibly, at gunpoint. The van was not the only mode of transportation available to defendants; they had their own vehicle. Those facts alone create a jury question as to defendants' intent. From that evidence, a jury could find that, however long defendants planned or ultimately would use and control the van, they had no intent to return it or to ensure its return after using it. To the contrary, because defendants' goal was to abduct the children, a jury could conclude that defendants took the van to frustrate the caseworkers' ability to use it to pursue them and that defendants took Nelson's cell phone to prevent the caseworkers from using it to alert authorities to the children's abduction. Nelson's and Barrett's ability to use the van and its contents—such as the cell phone—at that critical point in time was a significant property right, one that was lost to them because of defendants' conduct. The jury readily could infer that defendants intended exactly that result, thus satisfying the definition of appropriating property under ORS 164.005(1)(a), as well as the definition of depriving another of property under ORS 164.005(2)(a).

Alternatively, from the evidence, the jury reasonably could infer that defendants did not intend at the outset to abandon the van a short distance later but instead intended to use it indefinitely, as long as its use suited their purposes. In that regard, the evidence showed that defendants' ultimate objective was to transport the children out of state to a remote area in the mountains of Montana. They had maps that suggested possible rendezvous points or other stops along the way. Under the circumstances, the jury could infer that all plans at that point were contingent on success

and that, if switches to other vehicles were frustrated by the close pursuit or aerial observations of police, defendants would continue traveling in the van indefinitely, until they either escaped detection or were caught. Such an intent satisfies the theft and robbery statutes.

Finally, the jury could find the requisite intent on yet a third theory: when defendants stole the van, they intended to use it and then abandon it exactly as they eventually did—that is, by driving the van a short distance, meeting up with the driver of the white SUV, then leaving the van and the Datsun in a remote location where the vehicles would not be readily visible and might go undetected by police or by anyone who would return the van to the state. As noted, the map that police found in defendants' car, together with the two-way radios, suggested that defendants were planning to rendezvous with another driver and vehicle at some point. The other location marked on the map was another remote mill location. When defendants abandoned the van at the Round Prairie Mill, they left the van in a place where it was obscured from view by tall berry vines. Authorities did not catch up with either defendant until they made it to Montana. But for the fortuitous presence of the mill workers, who noticed the suspicious activities of the driver of the white SUV while he was waiting for defendants to arrive, the van might have gone undetected by police for an extended period, perhaps indefinitely. Meanwhile, the keys remained in the van, along with other personal possessions such as Nelson's cell phone, making the van and its contents easy targets for vandalism or further theft if detected by someone who happened upon the abandoned vehicles. Those circumstances permit a reasonable inference that defendants intentionally abandoned the van in such a way and under such circumstances that the state was at risk of suffering a permanent deprivation of its property. That inference, too, satisfies the intent required for theft and, therefore, robbery. *Langis*, 251 Or at 132-33.

In sum, on this record, defendants' intent was a jury question. Multiple inferences are permissible from the facts, and any one of those inferences is adequate to establish that defendants intended to appropriate the van and its contents, or to deprive state caseworkers of that property, within the

meaning of the pertinent statutes. The trial court therefore correctly denied defendants' motions for judgments of acquittal.

Affirmed.